UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
IRVING H. PICARD, *Trustee for the Liquidation of*                      :
*Bernard L. Madoff Investment Securities LLC and*                       :
*Bernard L. Madoff*,                                                    :
                                                                        :        20-CV-1029 (JMF)
                                             Plaintiff,                  :
                                                                        :        OPINION AND ORDER
                        -v-                                              :
                                                                        :
RAR ENTREPRENEURIAL FUND, LTD., et al.,                                 :
                                                                        :
                                             Defendants.                 :
                                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

On December 11, 2008, Bernard L. Madoff was arrested and charged in connection with what is presumed to be the largest Ponzi scheme in history. In the more than dozen years since, as Madoff has sat in prison, lawyers and judges have spent countless hours dealing with the mess he left behind. Perhaps no lawyer has spent more hours doing so than Irving H. Picard (the "Trustee"), who was appointed in 2008 as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS LLC") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"). In that role, he has brought dozens of cases to recover funds that were allegedly fraudulently transferred from BLMIS LLC. This is yet another such case.

Here, the Trustee seeks to avoid and recover $12,800,065 that was allegedly fraudulently transferred to Defendant RAR Entrepreneurial Fund, Ltd. ("RAR"). Now pending are the Trustee's and RAR's cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, the Trustee's motion is granted in part and denied in part, while RAR's cross-motion is denied in full.

## BACKGROUND

Madoff's scheme "has been the subject of a wide variety of decisions" by the Second Circuit and judges of this Court. *Picard v. Gettinger* (*In re Bernard L. Madoff Inv. Sec. LLC*), 976 F.3d 184, 188 (2d Cir. 2020). "Because the facts are well documented across many pages of Federal Reporters," *id.*, the Court assumes familiarity with the general background of Madoff's scheme and prior proceedings and recounts them only briefly here.

### A. Madoff's Scheme

In January 1960, Madoff registered with the Securities and Exchange Commission ("SEC") as a broker-dealer and was assigned Registrant Number 8-8132. ECF No. 26 ("Def.'s 56.1 Response"), ¶ 7. Through that registration, Madoff became a member of the Securities Investor Protection Corporation (the "SIPC") when SIPA was enacted in 1970. *Id.* From 1960 until 2001, Madoff ran his broker-dealer business as a sole proprietorship, frequently using the trade name "Bernard L. Madoff Investment Securities" ("Madoff Securities"). Def.'s 56.1 Response ¶ 8; ECF No. 34 ("Pl.'s 56.1 Counter-Response"), ¶¶ 7-8. Madoff Securities operated three business units: (1) a proprietary trading business, (2) a market-making business, and (3) an investment advisory business. Def.'s 56.1 Response ¶ 13; Pl.'s 56.1 Counter-Response ¶ 1. The proprietary trading business traded for its own account to make money for the broader broker-dealer business. Def.'s 56.1 Response ¶ 14. The market-making business made markets in certain stocks, bonds, warrants, and rights. *Id.* ¶ 15. The investment advisory business ostensibly bought and sold equities and options on behalf of its customer accounts. *Id.* ¶ 17.

In 2001, Madoff formed a limited liability company, BLMIS LLC, with himself as the sole member. *Id.* ¶ 9; ECF No. 18-12 ("Amended Form BD"). On January 12, 2001, Madoff filed an amended Form BD ("Amended Form BD") with the SEC that listed BLMIS LLC as the

"successor" to Madoff Securities and stated that, "effective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities, related to predecessor's business" and that "the transfer will not result in any change in ownership or control."  Def.'s 56.1 Response ¶ 10 (capitalization changed); Amended Form BD 11.  Thereafter, BLMIS LLC operated under the same SEC registrant number, 8-8132, previously used by the sole proprietorship.  Def.'s 56.1 Response ¶ 85.  As discussed below, these facts notwithstanding, the scope of what exactly Madoff Securities transferred to BLMIS LLC is disputed.

As noted, Madoff was arrested on December 11, 2008.  *Id.* ¶ 1.  Around the same time, the SEC brought an action against Madoff in this Court alleging civil violations of the federal securities law.  *Id.*  On December 15, 2008, the SEC consented to consolidation of its action with an application by the SIPC that alleged, among other things, that BLMIS LLC could not meet its obligations to securities customers as they came due and that its customers needed the protections afforded by the SIPA.  *Id.* ¶ 3.  That same day, this Court granted SIPC's application and entered an order appointing the Trustee for the liquidation of BLMIS LLC; appointing Baker & Hostetler LLP as counsel to the Trustee; and removing the case to the Bankruptcy Court.  *Id.* ¶ 4.  On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, the Bankruptcy Court substantively consolidated Madoff's Chapter 7 estate into the SIPA Proceeding.  *Id.* ¶ 6.

**B.  The Payments to RAR**

RAR is a limited partnership formed under the laws of, and with a principal place of business in, Florida.  *Id.* ¶ 107.  RAR was a customer of Madoff's investment advisory business and held BLMIS Account No. 1R0172 in the name of "RAR ENTREPRENEURIAL FUND," with an address in Miami, Florida, from at least April 3, 1998 through December 11, 2008 (the

"RAR Account"). *Id.* ¶ 108. Only five transactions took place in the RAR Account before the year 2000. *Id.* ¶ 113.

In November 2010, the Trustee brought this adversary proceeding against RAR under, as relevant here, Sections 548, 550, and 551 of the Bankruptcy Code. *See* ECF No. 1-3.[1] He filed the operative Amended Complaint on December 14, 2011. *See* Compl. On February 6, 2020, after the close of discovery, RAR moved to withdraw the bankruptcy reference, arguing that "because the Trustee's claims are actions at law[] for which Defendants have the constitutional right to a trial by jury . . . RAR is entitled to an order withdrawing the reference." ECF No. 1-2, at 1. The Court granted the motion to withdraw on the consent of the Trustee. *See* ECF No. 6 (citing *Buchwald v. Renco Grp.*, 539 B.R. 31, 36 (S.D.N.Y. 2015)). The Trustee moved for summary judgment on Count Two of the Amended Complaint (seeking to avoid and recover fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A)) on April 1, 2020, ECF No. 11, and RAR cross-moved for summary judgment on June 9, 2020, ECF No. 29.[2]

---

[1]     The Trustee named RAR's partners — Tamiami Tower Corporation, Robert Potamkin, Alan Potamkin, and Russell Oasis — as Defendants as well. *See* ECF No. 1-4 ("Compl."), ¶¶ 9-12. The Potamkins were dismissed without prejudice in April 2013. *See* Corrected Stipulation & Order, *Picard v. RAR Entrepreneurial Fund, Ltd.* (*In re Madoff*), Adv. Pro. No. 10-4352 (CGM) ("*RAR Case*") (Bankr. S.D.N.Y. Apr. 29, 2013), ECF No. 44; Corrected Stipulation & Order, *RAR Case* (Bankr. S.D.N.Y. Apr. 29, 2013), ECF No. 45. Oasis was later dismissed as a subsequent transferee. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff*), 531 B.R. 439, 473-74 (Bankr. S.D.N.Y. 2015); Order, *RAR Case* (Bankr. S.D.N.Y. July 16, 2015), ECF No. 65. Tamiami Tower Corporation, RAR's general partner, has never appeared in this matter. Although both parties agree RAR is the sole remaining defendant in this case, *see* ECF No. 12 ("Pl.'s Mem."), at 2 n.3; ECF No. 1 n.1, both Oasis and Tamiami Tower Corporation are currently erroneously listed on the docket as Defendants.

[2]     The original briefing schedule proposed by the parties and adopted by the Court did not contemplate a cross-motion by RAR. ECF Nos. 5, 7. Nevertheless, RAR asked for summary judgment in its opposition brief to the Trustee's motion filed on June 5, 2020, ECF No. 25 ("Def.'s Mem."), at 1, and filed a formal motion to that effect four days later, ECF No. 29. The Court declined the Trustee's request to strike RAR's cross-motion. ECF No. 32.

**LEGAL STANDARDS**

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The initial burden of establishing that no genuine factual dispute exists rests upon the party seeking summary judgment. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994). If the moving party shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).

In ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)

(internal citation omitted).  Indeed, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[W]hen," as here, "both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it.  When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981).  Finally, to the extent relevant here, in ruling on a summary judgment motion, a court may grant partial relief.  That is, the court may enter an order identifying any material fact, including any item of damages or other relief, not in genuine dispute and treat that fact as established in the case.  Fed. R. Civ. P. 56(g); *see, e.g.*, *AmTrust N. Am., Inc. v. KF&B, Inc.*, No. 17-CV-5340 (LJL), 2020 WL 5513458, at *1-2 (S.D.N.Y. Sept. 14, 2020).

## DISCUSSION

The Court begins, as it must, by addressing Defendants' threshold argument that the Trustee lacks standing to bring these claims in federal court.  After concluding that the Trustee does have standing and that the Court therefore has jurisdiction to rule on these issues, the Court then considers whether the Trustee has proved each element of his claim.  For the reasons that follow, the Court finds that the Trustee has satisfied his burden on two of the three elements of

his cause of action, but that a genuine dispute of material fact precludes summary judgment on the third.  Finally, the Court considers RAR's affirmative defenses.

## A.  Standing

RAR's primary argument is that the Trustee lacks standing to bring these claims because BLMIS LLC never owned the bank accounts from which the transfers in question were made.[3] Instead, citing evidence that checks drawn on one of the bank accounts (the 509 Account) listed "Bernard L. Madoff" as the drawer of the check and that the bank statements for another account listed the account holder as "Bernard L. Madoff Investment Securities," without the "LLC," RAR contends that the accounts were owned by Madoff individually or by the sole proprietorship (referred to here, for avoidance of confusion, as Madoff Securities) and were never transferred to BLMIS LLC after the LLC was formed in 2001.  *See* Def.'s Mem. 6-13; ECF No. 36 ("Def.'s Reply"), at 1-4; Pl.'s 56.1 Counter-Response ¶¶ 18-38.  Because the Trustee serves as SIPA trustee for the liquidation of BLMIS LLC only, RAR argues, the Trustee lacks standing to bring these claims.  Def.'s Mem. 9-11.

RAR is not the first defendant to make this argument in response to an avoidance and recovery action brought by the Trustee.  The defendants in *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC* (*In re Madoff*) ("*Nelson*"), 610 B.R. 197 (Bankr. S.D.N.Y. 2019), who were represented by the same counsel as RAR is here, did so as well.  The Bankruptcy Court rejected the argument, explaining that it "conflate[d] subject matter jurisdiction with the merits of the Trustee's claims."  *Id.* at 216.  Because the Trustee "brings the

---

[3]     During the ten-year period before his arrest, Madoff primarily used three bank accounts in connection with his investment advisory business: an account at JPMorgan Chase Bank, N.A. ("JPMorgan") ending in 1703 (the "703 Account"); a JPMorgan account ending in 1509 (the "509 Account"); and a Bankers Trust account ending in 599 (the "BT Account").  Def.'s 56.1 Response ¶ 69.

avoidance actions as a representative of an insolvent customer property estate to avoid and

recover transfers for the benefit of the customer property estate which was injured by the

fraudulent transfers of customer property, and the Trustee's action will redress that injury by

replenishing the funds in the customer property estate available to satisfy the customers' net

equity claims in the SIPA proceeding," the Trustee "certainly has standing to argue that BLMIS

[LLC] made the Two-Year Transfers.  If he cannot prove this, he will lose on the merits."  *Id.* at

215-16 (footnote omitted); *accord Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*

("*Epstein*"), Adv. Pro. No. 10-4438 (CGM), ECF No. 155, at 6 (Bankr. S.D.N.Y. Jan. 27, 2021).

This same reasoning applies here.

In any event, even if RAR were correct in framing the issue of account ownership as a

matter of standing, the Trustee has met his burden for purposes of summary judgment.  "In

response to a summary judgment motion, . . . the plaintiff can no longer rest on . . . mere

allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of

the summary judgment motion will be taken to be true."  *Lujan v. Defs. of Wildlife*, 504 U.S.

555, 561 (1992) (internal quotation marks and citation omitted).  Here, as described in greater

detail below, the Trustee has provided evidence of "specific facts" showing that BLMIS LLC

made the transfers that he seeks to avoid and recover in this action.  This evidence includes

(1) the Amended Form BD from 2001, which indicated that (a) BLMIS LLC was "succeeding to

the business of" its predecessor, Bernard L. Madoff, then registered as a broker-dealer;

(b) "predecessor will transfer to successor all of predecessor's assets and liabilities, related to

predecessor's business"; and (c) "the transfer will not result in any change in ownership or

control," Amended Form BD 5, 10-11 (emphasis and capitalization omitted); and (2) the fact that

the account statements for the 509 and 703 Accounts were addressed to the attention of either

Tony Tiletnick or Daniel Bonventre, both BLMIS LLC employees, at the BLMIS LLC business address, and that no statements were addressed to Madoff personally, Def.'s 56.1 Response ¶ 88. This evidence, even though disputed, satisfies the Trustee's burden to demonstrate standing here. *See, e.g.*, *Arce v. O'Connell*, 427 F. Supp. 2d 435, 441 (S.D.N.Y. 2006); *see also Epstein*, Adv. Pro. No. 10-4438 (CGM), ECF No. 155, at 6 (holding on cross-motions for summary judgment with similarly situated defendants that the Trustee had standing). Accordingly, RAR's motion for summary judgment on the ground that the Trustee lacks standing must be and is denied.

## B.  The Trustee's Claims

The Court turns, then, to the Trustee's motion. The Trustee seeks, pursuant to 11 U.S.C. § 548(a)(1)(A), to avoid and recover transfers of fictitious profits made to RAR. Section 548(a)(1)(A) provides in relevant part that the Trustee "may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay, or defraud any [creditor]." To prove a claim under this provision, therefore, the Trustee must prove three elements: (1) a transfer of an interest of the debtor (here, BLMIS LLC) in property; (2) made within two years of the date the debtor filed for bankruptcy (here, December 11, 2008); (3) with actual intent to hinder, delay, or defraud a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, Nos. 05-CV-9050 (LMM) & 03-MD-1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd sub nom. Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110 (2d Cir. 2014); *Nelson*, 610 B.R. at 232. The Court will address each element in turn, beginning with the second and third.

### 1. Transfers Made Within Two Years of the Filing Date

First, there is no genuine dispute that the relevant transfers were made within two years of the bankruptcy filing date (that is, within the "Two-Year Period").  The Trustee provides reports from experts who were able to reconcile all but one of the sixty-four cash transactions reflected on the RAR Account customer statements by matching cash deposits and withdrawals reflected on the statements to information or data from other sources (e.g., amounts on BLMIS LLC/Madoff Securities bank records, correspondence between the customer and BLMIS LLC/Madoff Securities regarding incoming deposits or requests for withdrawals, or documents produced to the Trustee relating to the RAR Account), and thus managed to trace 100% of the cash withdrawals reflected on the RAR Account's customer statements within the Two-Year Period. ECF No. 15-21, at 5-10; *see also* ECF No. 15-1; ECF No. 17-10.

RAR does not rebut this evidence with expert evidence of its own.  In fact, when the transfers were made, and in what amounts, are issues to which RAR barely adverts in its briefs.  Accordingly, any argument on this point has been forfeited.  *See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 104 & n.4 (S.D.N.Y. 2020).  RAR's opening brief does contain a section header titled "The Expert *Reports* Are Not Admissible," but the text that follows refers only to *Bruce Dubinsky's* expert report.  Def.'s Mem. 15-17 (emphasis added).  Nevertheless, to the extent that RAR argues that Dubinsky's report is inadmissible — because it is based, in large part, on Madoff Securities/BLMIS LLC books and records, which are themselves inadmissible because they are "permeated with fraud" and thus impermissible hearsay, *id.* — the argument could be read to extend to the Collura and Greenblatt reports as well.  *See also* Def.'s 56.1 Response ¶¶ 115-36 (raising this objection).

In any event, RAR's argument is meritless because the Madoff Securities/BLMIS LLC books are admissible as business records under Rule 803(6) of the Federal Rules of Evidence.  In arguing otherwise, RAR rests on the Rule's exclusion of documents where "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6)(E); *see* Def.'s Mem. 15-17; Def.'s Reply 7-9.  But the mere fact that Madoff Securities/BLMIS LLC was a fraudulent enterprise does not preclude admission of its books and records under the business records exception where, as here, the Trustee provides corroborating evidence of the accuracy of the cash transactions reflected therein.  *See Curtis v. Perkins* (*In re Int'l Mgmt. Assocs., LLC*), 781 F.3d 1262, 1267-69 (11th Cir. 2015) (per curiam) (upholding the admission of a Ponzi scheme's books and records under Rule 803(6), even though the business "was not set up to, and did not, conduct any legitimate business at all," because the bankruptcy trustee had "presented enough circumstantial evidence to establish the trustworthiness of the underlying documents").  Notably, other defendants in actions brought by the Trustee, including some represented by RAR's counsel here, have raised substantially similar objections, all without success.  *See, e.g.*, *Blecker v. Picard* (*In re Bernard L. Madoff Inv. Sec., LLC*), 605 B.R. 570, 586 (S.D.N.Y. 2019), *aff'd*, 830 F. App'x 669 (2d Cir. 2020) (summary order); *Nelson*, 610 B.R. at 223; *see also Blecker*, 830 F. App'x at 671 ("[F]or the same reasons as discussed at length by the District Court in its thorough opinion, we conclude that the Bankruptcy Court did not exceed the permissible bounds of its discretion by admitting BLMIS's books and records and the Trustee's summary exhibits under the applicable Federal Rules of Evidence." ).  For the same reasons, the Court rejects RAR's arguments here and finds the Trustee's expert reports admissible.

In sum, RAR forfeited any arguments challenging whether the transfers at issue were made within the Two-Year Period.  And, in any event, the Trustee has established with admissible evidence that transfers totaling $12,800,065 were made to RAR within the Two-Year Period.  Accordingly, the Trustee has established the second element of his claim.

### 2.  Transfers Made with the Actual Intent to Hinder, Delay, or Defraud

Next, the Trustee must prove that the transfers were made with the actual intent to hinder, delay, or defraud a creditor.  Significantly, "[t]he intent to hinder, delay or defraud creditors is presumed if the Trustee can prove that (1) the transferor operated a Ponzi scheme; and (2) the transfers made to the transferee by the debtor were 'in furtherance' of the Ponzi scheme." *Nelson*, 610 B.R. at 233; *accord Moran v. Goldfarb*, No. 09-CV-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012) (Sullivan, J.); *Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*), Nos. 11-MC-12 (KMW) et al., 2011 WL 3897970, at *4 (S.D.N.Y. Aug. 31, 2011).  "A 'Ponzi' or 'Pyramid' Scheme is a fraudulent investment scheme in which money contributed by later investors is used to pay artificially high dividends to the original investors, creating an illusion of profitability, thus attracting new investors." *Ades-Berg Inv'rs v. Breeden* (*In re Bennett Funding Grp., Inc.*), 439 F.3d 155, 157 n.2 (2d Cir. 2006); *accord Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008).  "Because Ponzi schemes use investor deposits rather than profits to pay returns, they are insolvent and become more insolvent with each transaction." *Nelson*, 610 B.R. at 233 (citing *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014)).  Thus, "[t]he logic for applying a presumption of actual intent to defraud in the Ponzi scheme scenario is tied to the fact that a Ponzi scheme cannot work forever.  When the pool of investors runs dry — as it will — the operator knows that the scheme will collapse and that those still invested in the enterprise will lose their money." *Christian Brothers High Sch. Endowment v. Bayou No*

*Leverage Fund, LLC* (*In re Bayou Grp., LLC*), 439 B.R. 284, 306 n.19 (S.D.N.Y. 2010) (internal quotation marks omitted).

Here, there is ample admissible evidence to support a finding that the transferor operated a Ponzi scheme and that the transfers made to RAR were in furtherance of that scheme — and no reasonable factfinder could conclude otherwise. First, the Trustee points to the plea allocutions of Madoff and other BLMIS LLC employees in the criminal proceedings relating to Madoff's fraud. *See* Def.'s 56.1 Response ¶¶ 89-106. Madoff himself testified that "for many years up until [his] arrest on December 11, 2008, [he] operated a Ponzi scheme through the investment advisory side of [his] business, Bernard L. Madoff Securities LLC." ECF No. 18-4 ("Madoff All."), at 23. Madoff explained that "[t]he essence of [his] scheme was that [he] [falsely] represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with [him] that [he] would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal." *Id.* at 24. In reality, however, Madoff "never invested these funds in the securities" and "[i]nstead, those funds were deposited in a bank account at Chase Manhattan Bank." *Id.* "When clients wished to receive the profits they believed they had earned with [Madoff] or to redeem their principal, [Madoff] used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds." *Id.* Madoff further explained that he fraudulently misrepresented that he had utilized a "split strike conversion strategy" (the "SSC Strategy") of purchasing a basket of stocks chosen to mimic the Standard & Poor's 100 Index, hedging the investments by buying and selling option contracts relating to those stocks, and opportunistically timing the sale of the securities and investing the funds in U.S. Treasury bills ("T-Bills") during these periods. *See id.* at 25-26. To "cover up the

13

fact that [he] had not executed trades on behalf of [his] investment advisory clients, [he] knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients." *Id.* at 27.  Madoff "never engaged in [the] transactions represented on the statements and confirmations." *Id.*

Madoff's admissions are corroborated by the criminal plea allocutions of other former BLMIS LLC employees.  For example, Frank DiPascali confirmed that, although "Madoff had thousands of clients who believed their funds were being invested" according to the SSC Strategy, in fact, "[f]rom at least the early 1990s through December" 2008, "[n]o purchases of [sic] sales of securities were actually taking place in their accounts.  It was all fake.  It was all fictitious."  ECF No. 18-5 ("DiPascali All."), at 46.  DiPascali further explained that "[o]n a regular basis [he] used hindsight to file historical prices on stocks[,] then [he] used those prices to post purchase of [sic] sales to customer accounts as if they had been executed in realtime" and "regular[ly] . . . added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client." *Id.* at 47.  David Kugel, Irving Lipkin, Eric Lipkin, and Enrica Cotellessa-Pitz — all former BLMIS LLC employees — made admissions of a similar nature. *See* ECF No. 18-6 (Kugel), at 32 ("I provided historical trade information to other BLMIS employees, which was used to create false, profitable trades in the Investment Advisory clients' accounts at BLMIS . . . [that] gave the appearance of profitable trading when in fact no trading had actually occurred."); ECF No. 18-7 (I. Lipkin), at 30-31 ("I made accounting entries in financial records that I knew were inaccurate. . . .  These filings helped Mr. Madoff run the Ponzi scheme . . . .  [T]he numbers in the general ledger and the stock records, some of which were false, went into the firm's . . . annual financial statements, which in turn were sent to some customers."); ECF No. 18-8 (E.

Lipkin), at 32-34 ("I created fake [Depository Trust Corporation ("DTC")] reports . . . [for the purpose of falsely] confirm[ing] positions at several investment advisory accounts that we were reporting at."); ECF No. 18-9 (Cotellesa-Pitz), at 32 ("I booked the transfers of funds at times into specific securities or trading positions and accounts that were part of the firm's Proprietary Trading and Market Making businesses. . . .  [These] transfers bore no relation to these securities or positions, and . . . the funds did not result from trading in these securities through the firm's Proprietary Trading and Market Making businesses and, therefore, . . . were false.").

In addition, the Trustee's expert, Dubinsky, submitted a report confirming that Madoff's investment advisory business was a Ponzi scheme.  ECF No. 16-1 ("Dubinsky Rep.").  Dubinsky concluded that the SSC Strategy purportedly adopted in the early 1990s was fictitious and that the purported transactions never occurred.  In particular, Dubinsky concluded that Madoff Securities/BLMIS LLC did not conduct any trading on behalf of its investment advisory business customers based on (1) the impossible reported volume of equity trades; (2) the impossible equity and options trades reported outside the daily price range; (3) the low volatility in its reported daily trading performance compared to actual market behavior and the performance achieved by Madoff Securities/BLMIS LLC in the Proprietary Trading Business unit as measured by the volume weighted average prices for its sales and purchases; (4) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (5) a lack of any DTC records to confirm the reported equity and treasury trades; and (6) a lack of Options Clearing Corporation records to confirm the reported options trades.  *Id.* ¶¶ 155-81, 194-223.  Madoff Securities/BLMIS LLC claimed that, in addition to purchasing stocks and options collars, it would intermittently invest investment advisory business customer funds in T-Bills as part of the SSC Strategy.  *Id.* ¶ 44.  But Dubinsky found no evidence of such purchases having been made.

While Madoff Securities/BLMIS LLC purchased T-Bills with customer funds, these purchases did not match the allocation of T-Bill transactions that appeared on customer statements. *Id.* ¶¶ 224-40.

RAR did not disclose its own experts or rebut Dubinsky's report; it did not even take Dubinsky's deposition. *See* Pl.'s Mem. 13. Instead, reprising arguments that have been repeatedly rejected in other Madoff-related cases, it challenges the admissibility of the plea allocutions and the credibility of Dubinsky's report. *See* Def.'s Mem. 13-19; Def.'s Reply 7-9.[4] These arguments are without merit. First, the plea allocutions are admissible pursuant to Rule 803(22) of the Federal Rules of Evidence. "Under this rule, evidence of a final judgment entered after a trial or upon a plea of guilty is not inadmissible hearsay to prove any fact essential to prove a judgment against persons other than the accused in collateral civil actions." *S.E.C. v. Sekhri*, No. 98-CV-2320 (RPP), 2002 WL 31100823, at *12 (S.D.N.Y. July 22, 2002); *accord Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94-CV-2727 (WK) (AJP), 1997 WL 906427, at *4 n.7 (S.D.N.Y. Sept. 12, 1997) ("[P]lea allocutions are admissible pursuant to Fed. R. Evid. 803(22)." (collecting cases)). Indeed, courts in this District have repeatedly considered such evidence to establish the Ponzi scheme presumption. *See, e.g.*, *Moran*, 2012 WL 2930210, at *4 ("[The transferor's] guilty plea provides ample evidence of his 'actual intent' to defraud." (citing *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995)); *Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 12 (S.D.N.Y. 2007) (concluding that a criminal information to which a defendant pleaded guilty provided "ample support in the record" for the

---

[4]     In addition, RAR challenges Dubinsky's testimony on the ground that it is based on the books and records of Madoff Securities/BLMIS LLC, which are themselves inadmissible because they were permeated with fraud. *See* Def.'s Mem. 15-16. The Court discussed — and rejected — that argument above.

Ponzi scheme presumption); *McHale v. Boulder Capital LLC* (*In re 1031 Tax Grp., LLC*), 439

B.R. 47, 72 (Bankr. S.D.N.Y.) ("[C]ourts readily accept admissions from guilty pleas of officers

from companies involved in fraudulent activities, as evidence that the fraud was a Ponzi

scheme."), *as supplemented*, 439 B.R. 78 (Bankr. S.D.N.Y. 2010).  In fact, the Bankruptcy Court

has repeatedly held that the very allocutions offered by the Trustee here are admissible to prove

that Madoff operated a Ponzi scheme.  *See Nelson*, 610 B.R. at 209; *Sec. Inv'r Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff*) ("*BAM I*"), 608 B.R. 165, 172 & n.12, 174-75

(Bankr. S.D.N.Y. 2019); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re*

*Madoff*) ("*Legacy Capital*"), 603 B.R. 682, 689-90 & n.8 (Bankr. S.D.N.Y. 2019).

      Relying on *Gowan v. Amaranth Advisors L.L.C.* (*In re Dreier LLP*), Nos. 08-15051

(SMB) et al., 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014), RAR contends that the plea

allocutions are inadmissible because whether Madoff and his associates were engaged in a Ponzi

scheme was not "essential to the judgment[s]" in their cases, as Rule 803(22) requires.  Def.'s

Mem. 17.  The Bankruptcy Court has considered and rejected this precise argument at least

twice:

> [A]lthough operating a Ponzi scheme will typically lead to criminal charges as was the
> case with Madoff, DiPascali and others at BLMIS, there is no specific crime entitled
> "Ponzi scheme."  Here, Madoff (and DiPascali) committed the crimes of, among others,
> securities fraud, investment adviser fraud, mail fraud, money laundering and wire
> fraud *through the operation of a Ponzi scheme.*  The Madoff and DiPascali Allocutions
> established the elements of a Ponzi scheme as the predicate for their crimes and for the
> District Court's acceptance of their guilty pleas.

*BAM I*, 608 B.R. at 175; *accord Nelson*, 610 B.R. at 210 n.8; *see also BAM I*, 608 B.R. at 172

n.12 (discussing the Kugel, Irwin and Eric Lipkin, and Cotellessa-Pitz plea allocutions); *Nelson*,

610 B.R. at 210 n.9 (discussing many of the same).  Additionally, the Bankruptcy Court

explained that *Gowan* is easily distinguished because there, unlike in the cases of Madoff and his

associates, the criminal defendant "never allocuted that he used the proceeds from later investors

to pay earlier investors." *Nelson*, 610 B.R. at 210; *accord BAM I*, 608 B.R. at 175.  (In fact, the *Gowan* court itself specifically distinguished the facts there from those at issue here by noting that "[t]he breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of [the BLMIS liquidation], particularly in light of Madoff's criminal admission."  2014 WL 47774, at *12 (quoting *Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011)).)  The Court agrees with and adopts the analysis of the Bankruptcy Court here.

Meanwhile, RAR contends that Dubinsky's testimony is "patently incredible," Def.'s 56.1 Response ¶ 24, because he committed "flagrant perjury" in his trial testimony in *Nelson*, Def.'s Mem. 20; *see also id.* at 4, 13, 16-19.  In particular, RAR asserts that although Dubinsky testified "that Madoff never used [investment advisory] customers' funds to purchase securities," he admitted "on cross-examination . . . that Madoff had used [investment advisory] customers' money to purchase T-bills that appeared on customer statements."  *Id.* at 13.  But this assertion does not withstand scrutiny.  Dubinsky's trial testimony is consistent with the conclusions drawn in his report, which explicitly states that "[t]o earn interest on the cash it held since it was not using the cash to purchase actual securities for [investment advisory] [b]usiness customers, the [investment advisory] [b]usiness purchased certain US Treasury Bills . . . using funds from the JPMC 703 bank account.  Those Treasuries were held in various brokerage accounts and/or the JPMC custody account #G 13414 . . . ."  Dubinsky Rep. ¶ 228; *see also id.* ¶ 340 & fig.52.  Crucially, however, Dubinsky goes on to explain that he "performed various analyses . . . to determine whether the Treasuries held in the Brokerage Accounts were purchased for the [investment advisory] [b]usiness customers.  Based on these analyses, [he] conclude[d] that the

[investment advisory] [b]usiness did not purchase any of those Treasuries for [investment advisory] [b]usiness customers." *Id.* ¶ 228.

More specifically, he determined that the aggregate volume of purported investment advisory business T-Bills reported on the customer statements far exceeded the volume of T-Bills in the brokerage accounts and the proprietary trading business, *id.* ¶¶ 230-31, and that the T-Bills held in the brokerage accounts did not match the T-Bills reported on the investment advisory business customer account statements, *id.* ¶¶ 232-40.  Indeed, there were only twenty instances — out of approximately 4,660 unique transactions — in which the investment advisory business customer accounts purportedly purchased and sold a T-Bill on the same dates as the brokerage accounts.  *Id.* ¶ 236  In each of these twenty instances, the purported volume of the T-Bills purchased and sold in the aggregate by the investment advisory business was *higher* than the actual volume purchased and sold the by the brokerage accounts.  *Id.* ¶ 239.  In other words, "the Treasuries held by the [b]rokerage [a]ccounts were not the same Treasuries that appeared on the [investment advisory] [b]usiness customer statements."  *Id.*  These conclusions are consistent with Dubinsky's trial testimony in *Nelson*, upon which the Bankruptcy Court relied in reaching its findings.  *See Nelson*, 610 B.R. at 213-14.  RAR suggests otherwise only by taking excerpts of Dubinsky's testimony out of context.  *See* Pl.'s 56.1 Counter-Response ¶¶ 53-59.

Citing a document marked as "Exhibit AF," RAR claims that "third-party records" show that on various dates Madoff purchased and sold T-Bills and credited the T-Bills or sales from their proceeds in the RAR Account.  *See* Pl.'s 56.1 Response ¶¶ 61-84.  As an initial matter, however, the accompanying declaration from counsel provides no explanation of Exhibit AF's provenance, describing it only as "a chart of T-Bills owned by Madoff account 1R0172 in the name of RAR Entrepreneurial Fund, with its attachments."  ECF No. 28 ("Chaitman Decl."),

¶ 34.  Without a proper foundation from a witness with personal knowledge, the Court cannot and will not consider the document.  *See, e.g.*, *Sys. Agency v. Villanueva*, No. 19-CV-6486 (JMF), 2020 WL 7629879, at *1 (S.D.N.Y. Dec. 22, 2020) ("[D]ocuments that are not attached to an affidavit made on personal knowledge setting forth facts that would be admissible in evidence and sufficient to authenticate the document cannot be considered on summary judgment." (internal quotation marks omitted)); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997))).  Moreover, even if the chart were admissible and accurately reflected T-Bill purchases and sales made by Madoff and credits to the RAR Account, it would not bear on the reliability or credibility of Dubinsky's conclusion that any T-Bills purchased or sold by Madoff Securities/BLMIS LLC were not made on any investment advisory business customer's behalf because, even on those few instances where the dates on which T-Bills were actually purchased or sold in the brokerage accounts matched the dates reflected in investment advisory business customer statements, the purported volume of T-Bills purchased and sold in the aggregate by the investment advisory business was higher than the actual volume purchased and sold in the brokerage accounts.[5]

---

[5]      RAR argues that "the Trustee is barred from making" the argument "that Madoff did not own enough T-bills to cover the more than 5,000 customer accounts he held in the [investment advisory] business" because "the Trustee refused to produce the account statements of all of Madoff's [investment advisory] customers."  Def.'s Mem. 21.  But that argument borders on frivolous.  The Bankruptcy Court roundly rejected the very same argument, raised by way of a motion to compel, describing it as "based on" a "false narrative."  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff*), Nos. 08-1789 (SMB) et al., 2020 WL 1488399, at *2-4 (Bankr. S.D.N.Y. Mar. 20, 2020).  Indeed, the Bankruptcy Court not only denied defense counsel's motion to compel, but also ordered defense counsel to pay the Trustee's fees and costs pursuant to Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure.  *Id.* at *19.

Finally, RAR's attempt to link particular T-Bill purchases or sales by the investment advisory business with the T-Bills purportedly reflected in the RAR Account fails for a more fundamental reason.  "[I]t is in the nature of a Ponzi scheme that customer returns are generated not from legitimate business activity but, rather, through the influx of resources from new customers.  'Since all the funds were obtained by fraud, to allow some investors to stand behind the fiction that [the] Ponzi scheme had legitimately withdrawn money to pay them would be carrying the fiction to a fantastic conclusion.'"  *S.E.C. v. Credit Bancorp, Ltd.*, No. 99-CV-11395 (RWS), 2000 WL 1752979, at *40 (S.D.N.Y. Nov. 29, 2000) (quoting *Heyman v. Kemp* (*In re Teltronics, Ltd.*), 649 F.2d 1237, 1241 (7th Cir. 1981)), *aff'd*, 290 F.3d 80 (2d Cir. 2002).  Thus, "[i]t is no answer that some or for that matter all of" the investment advisory business's "profit may have come from 'legitimate' trades . . . .  They were not legitimate.  The money used for the trades came from investors gulled by fraudulent representations."  *Armstrong v. Collins*, Nos. 01-CV-2437 (PAC) et al., 2010 WL 1141158, at *23 (S.D.N.Y. Mar. 24, 2010) (quoting *Scholes*, 56 F.3d at 757); *see also S.E.C. v. Byers*, 637 F. Supp. 2d 166, 177, 182 (S.D.N.Y. 2009) (Chin, J.) (noting that "in a Ponzi scheme, all distributions of 'profit' are illusory" and that "[t]he alternatives to pro rata distribution that have been proposed would create unfair results by rewarding certain investors over others based on arbitrary factors"), *aff'd sub nom. S.E.C. v. Malek*, 397 F. App'x 711 (2d Cir. 2010) (summary order), *and aff'd sub nom. S.E.C. v. Orgel*, 407 F. App'x 504 (2d Cir. 2010) (summary order).

In sum, the Trustee has also established the third element of his claim, that the transfers were made with actual intent to hinder, delay, or defraud a creditor.

**3.   Transfer of an Interest of the Debtor in Property**

Finally, the Trustee must also prove that there was a transfer of an interest of the debtor in property to prevail on his motion for summary judgment.  RAR's primary argument on this score is that the relevant accounts from which the transfers to RAR were made belonged to Madoff Securities, the sole proprietorship, and were never transferred to BLMIS LLC after it was formed in 2001.  Thus, RAR argues, the Trustee, who is the trustee for the SIPA liquidation of BLMIS LLC, cannot avoid and recover such transfers.  Def.'s Mem. 8-13; Def.'s Reply 1-3.

Notably, two similarly situated defendants made precisely this argument before the Bankruptcy Court and lost after trials.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)* ("*BAM II*"), 624 B.R. 55, 61 (Bankr. S.D.N.Y. Dec. 11, 2020) ("[T]his Court finds that all of the assets and liabilities of the sole proprietorship, including the [investment advisory] [b]usiness, were transferred to BLMIS [LLC] via the 2001 SEC Amended Form BD. As such, the Defendants['] customer accounts and the Bank Accounts are property of BLMIS [LLC] and the monies paid to Defendants from those Bank Accounts must be turned over to the Trustee." (footnote omitted)); *Nelson*, 610 B.R. at 218 ("Madoff was not particularly attentive to the names he used in operating his Ponzi scheme but his representations made to the SEC confirm that Madoff Securities ceased to operate on January 1, 2001.  At that moment, all of its business and business property was transferred to BLMIS [LLC].  No other person or entity retained any of that property and the Chase Accounts were maintained by BLMIS [LLC] to hold customer deposits . . . .").  The outcomes of these cases suggest that RAR faces an uphill battle and that the Trustee is ultimately likely to prevail on its claim.  But the Trustee does not argue that the outcomes of these cases are binding on RAR (and, thus, has forfeited any such argument).  For present purposes, therefore, the cases actually support RAR.  That is, they

support the conclusion that summary judgment cannot be granted for the Trustee on this element and, by extension, on his avoidance and recovery claim.  *See BAM I*, 608 B.R. at 177, 181.[6]

Indeed, that is the case.  Although the 2001 Amended Form BD provides compelling evidence that the accounts were transferred to BLMIS LLC, there is evidence from which a factfinder could conclude otherwise.  For instance, on Section 12 of the Form, which asks the applicant to "[c]heck types of business engaged in (or to be engaged in . . . ) by *applicant*," the boxes for "Broker or dealer making inter-dealer markets in corporate securities over-the-counter," "[t]rading securities for own account" and "[o]ther" were checked — but not the box for "[i]nvestment advisory services."  Amended Form BD 8-9.  Additionally, the investment advisory business received customers' cash deposits in the 703 Account maintained at JPMorgan, *see* Pl.'s Mem. 11; Def.'s 56.1 Response ¶¶ 69-70, and all withdrawals from the RAR Account were made by transfers from the 509 Account or 703 Account, *see* Pl.'s 56.1 Counter-Response ¶ 33.  The name listed on the customer statements for those Accounts for the duration of the relevant period did not include "LLC"; it was either "Bernard L. Madoff" or "Bernard L. Madoff Investment Securities" — i.e., the trade name of the sole proprietorship.  *Id.* ¶¶ 19-20, 25.  And through 2008, the endorsement stamp for checks deposited into the 703 Account read "For deposit only Bernard L. Madoff."  *Id.* ¶ 22.  Similarly, checks sent to RAR from the 509

---

[6]     The Court notes that the Bankruptcy Court in *Epstein* did grant summary judgment for the Trustee in an avoidance and recovery action against similarly situated defendants who "claim[ed] that they were customers of Madoff's sole proprietorship and not customers of BLMIS [LLC]."  Adv. Pro. No. 10-4438 (CGM), ECF No. 155, at 7.  In doing so, however, the *Epstein* Court merely stated it "ha[d] already determined that all of Madoff's customers were transferred to BLMIS [LLC]," without further analysis or any apparent consideration of whether collateral estoppel could apply.  *Id.* (citing *BAM II*, 624 B.R. at 60-61).  It is unlikely collateral estoppel could apply, and, as noted, the Trustee has forfeited any such argument here in any event.  For these reasons, the Court declines to follow *Epstein* and will instead follow the approach of the Bankruptcy Court in *BAM I*.  *See* 608 B.R. at 177.

Account listed "Bernard L. Madoff" as the account holder.  *Id.* ¶ 25.  Indeed, even when

"Bernard L. Madoff Investment Securities" was listed, the designation "LLC" never appeared on

the statements for either the 703 or the 509 Account.  *Id.* ¶ 29.  And while Madoff sent letters to

the Bank of New York — where the accounts for the proprietary trading and market-making

businesses were maintained, *id.* ¶ 5 — as well several governmental agencies notifying them of

the formation of the LLC, there is no evidence of any such letter being sent to JPMorgan, where

the accounts for the investment advisory business were maintained.  *See id.* ¶¶ 10-11.  In light of

this evidence, and drawing all inferences in favor of RAR, the Court cannot say that no

reasonable factfinder could conclude that either Madoff himself or the sole proprietorship

retained ownership over the 703 and 509 Accounts even after the LLC's formation in 2001.

 The Trustee argues that whether the owner of the accounts from which the transfers to

RAR were made was the sole proprietorship or the LLC is irrelevant for the purposes of

establishing the elements of his claim.  *See* Pl.'s Mem. 17-32; ECF No. 33 ("Pl.'s Reply"), at 2-

4.  Contending that the Bankruptcy Court's opinion in *Picard v. Avellino* (*In re Bernard L.*

*Madoff Investment Securities LLC*), 557 B.R. 89 (Bankr. S.D.N.Y. 2016), was wrongly decided,

he maintains: "[A]s long as the SIPA Trustee can show that the property he is seeking to recover

is customer property, he has the power to recover it whether that property is held in an account

with the letters 'LLC' or not."  Pl.'s Mem. 32; *see* Pl.'s Mem. 27-31.  But *Avellino*, which held

that the Trustee could not recover transfers made by the sole proprietorship or Madoff

individually prior to the formation of the LLC, presumed, as all parties apparently did, that the

sole proprietorship had transferred all assets to the LLC.  557 B.R. at 108 & n.14, 110.  Here, by

contrast, RAR's theory is that the sole proprietorship never transferred the investment advisory

business (and, by extension, ownership of the relevant accounts) to the LLC in the first place, but

rather continued operating independently alongside the LLC in order to "insulate" the proprietary trading and market-making businesses from the investment advisory business's fraudulent activities.  Def.'s Mem. 24.  Thus, even if the Trustee were correct that — contra *Avellino* — SIPA empowers him to recover transfers of customer property made by the sole proprietorship prior to the formation of the LLC, *assuming that the sole proprietorship transferred all assets to the LLC*, it does not follow that the Trustee may recover transfers of assets to which BLMIS LLC never succeeded.

Accordingly, the question of whether the Two-Year Transfers were transfers made by the debtor within the meaning of SIPA, 15 U.S.C. § 78fff-2(c)(3), and Section 548(a)(1)(A) of the Bankruptcy Code cannot be resolved here and, as in *BAM* and *Nelson*, requires trial.

### 4.  Affirmative Defenses

Finally, RAR asserts two affirmative defenses: (1) that it may retain the funds in dispute under 11 U.S.C. § 548(c) because it received the funds in good faith and gave value in exchange, *see* Def.'s Mem. 28-32, and (2) that 11 U.S.C. § 548(a) is a statute of repose that bars the Trustee from "avoiding both the obligation incurred more than two years before the filing and the payments that satisfied the antecedent obligation under § 548(c)," Def.'s Mem. 33-34.  In light of the Second Circuit's recent decision in *Gettinger*, however, these defenses are easily dismissed.

Like the defendants in *Gettinger*, RAR argues that "[t]he Second Circuit has confirmed that Madoff owed RAR debts and obligations at the time of each withdrawal" by holding that "every customer held a securities contract to which the payments the Trustee seeks to claw back related," the "payments were settlement payments responsive to customers' instructions to the broker to liquidate a portion of the securities in their accounts," and "[i]t follows, therefore, that there was an exchange of consideration at the time of each transfer, notwithstanding the broker's

fraud." Def.'s Mem. 29 (citing *Picard v. Ida Fishman Revocable Tr.* (*In Bernard L. Madoff Inv. Sec., LLC*), 773 F.3d 411, 418-19, 422-23 (2d. Cir. 2014)). In *Gettinger*, however, the Second Circuit explained that this argument "misreads our use of the phrase 'enforceable securities entitlement,' and mischaracterizes the context in which we used it." 976 F.3d at 196-97. "[R]egardless of whether the defendants[] had securities entitlements as a result of the account statements, they did not have property rights to the values in excess of principal reflected there. Accordingly, when BLMIS transferred those full values to the defendants[], the transfers were not in satisfaction of property rights and therefore were not 'for value.'" *Id.* at 198. The Second Circuit also rejected RAR's alternative argument rooted in Section 29(b) of the Exchange Act of 1934, "which allows an innocent party to a securities contract procured by fraud to choose to void or enforce the contract," because "a conclusion that the transfers were 'for value' would conflict with SIPA's legally binding priority system." *Id.* Holding otherwise would allow defendants to "retain funds that otherwise would be customer property distributed ratably to customers based on their net equity claims" and "[t]hat result would place the defendants[], who have no net equity and thus are not entitled to share in the customer property fund, ahead of customers who have net equity claims. SIPA does not permit it." *Id.* at 199.

RAR also argues that "the two-year statute of repose [in 11 U.S.C. § 548(a)(1)] applies to all claims under § 548(a) and bars a trustee from avoiding both the obligation incurred more than two years before the filing and the payments that satisfied the antecedent obligation under § 548(c)." Def.'s Mem. 34. In *Gettinger*, however, the Second Circuit rejected this argument as well, explaining that "[t]here is no such limitation on a trustee's 'legal authority' to compute exposure under the fraudulent transfer provisions." 976 F.3d at 201. There, as here, the Trustee sought to avoid and recover transfers of fictitious profits, which it determined by "netting the

amounts the defendants[] had received from BLMIS against the amounts they had invested in

BLMIS over time" and identifying only those "profits" that "were transferred to the defendants[]

in the two years prior to BLMIS filing for bankruptcy. This method abides § 548(a)(1)'s

protection of transfers made more than two years prior to the filing of the bankruptcy petition

while appropriately calculating harm or benefit to the estate, which is unrelated to a line drawn at

a certain point in time for purposes of granting finality to ancient transactions." *Id.* at 202

(internal quotation marks, citations, and alterations omitted).

In short, in light of *Gettinger*, RAR's affirmative defenses must be and are dismissed.

## CONCLUSION

In sum, pursuant to Rule 56(g), the Trustee's motion for summary judgment is

GRANTED with respect to two elements of its claim (namely, that the transfers at issue were

made within the Two-Year Period and with actual intent to hinder, delay, or defraud) but

DENIED with respect to final element (namely, whether the transfer consisted of an interest of

the debtor in property). RAR's cross-motion is DENIED, and its two affirmative defenses —

that it may retain the funds in dispute because it received them in good faith and gave value in

exchange and that Section 548(a) is a statute of repose that bars the Trustee's claim — are

dismissed.

The Court will hold a telephone conference on **March 18, 2021** at **4:00 p.m.** to address

the next steps in this case, including the nature of and deadline for submission of pretrial

materials, the scheduling of trial, and whether settlement is possible. Counsel should be

prepared to address, among other things, (1) whether the parties would consent to a bench trial

(whether conducted remotely or in person), mindful that it may be a very long time before a jury

trial can be held (given the inability to safely conduct a jury trial now and the many felony

criminal trials that will take precedence over this case once jury trials can safely resume); and (2) whether (and if so, when) a settlement conference should be held, with either the designated Magistrate Judge or a mediator.  To access the conference, counsel should call (888) 363-4749 and use access code 542-1540#.  Members of the press and public may call the same number, but will not be permitted to speak during the conference.  The parties are reminded to follow the procedures for teleconferences described in the Court's Emergency Individual Rules and Practices in Light of COVID-19, which are available at https://nysd.uscourts.gov/hon-jesse-m-furman.  Among other things, those procedures require counsel to provide advance notice of who will participate in the conference and the telephone numbers they will use to participate.

The Clerk of Court is directed to terminate ECF Nos. 11 and 29 and to terminate Russell Oasis and Tamiami Tower Corporation as defendants.

SO ORDERED.

Dated: March 3, 2021
      New York, New York

                                                 JESSE M. FURMAN
                                        United States District Judge